JOHN P. ALLISON v. WILLIAM WARD, CHARLES O. CONE, AND WILLIAM F. GLASBY.

*Representations—Vendor and vendee—Fraud—Proof of.*

1. Where a complainant, claiming to have been defrauded in the purchase of a saw-mill by the representations of the vendor as to the *value* of the property, and the *probable* amount of custom sawing that would be furnished by the community around it, made a *personal* examination of the property, and *inquiries* of parties living near it, and had *ample* opportunity to ascertain *all* of the facts bearing upon the *desirability* of making the purchase and the *value* of the property,—

   *Held,* that such representations, if *falsely* made, were insufficient to sustain a charge of fraud.

2. Fraud cannot be presumed, but must be established by a preponderance of the evidence; and where two witnesses affirm, and two others, no more interested in the subject-matter, and for all that appears fully as creditable, deny, the alleged fraud, it is not proved.

Appeal from Gratiot. (Hart, J.) Argued June 29, 1886. Decided October 14, 1886.

Bill filed to set aside a deed for fraud, and cancel notes and mortgage given for purchase price. Complainant appeals. Affirmed. The facts are stated in the opinion.

*D. W. C. Gage,* for complainant.

*J. L. Stoddard,* for defendants Ward and Cone.

CHAMPLIN, J. Complainant brings this suit to set aside a deed of a steam saw-mill, lands, and appurtenances, including a mill boom, situated at St. Louis, Gratiot county, Michigan, executed April 19, 1883, by defendants Cone and Ward to him, in consideration of $5,000,—$1,000 of which was paid down, and the balance secured by the notes of Allison and Glasby, and a mortgage executed by Allison upon the property purchased; and to set aside said mortgage and notes on the ground that complainant was induced to accept the deed, and execute the notes and mortgage, by the fraud of defendants Ward and Cone.

The fraud alleged to have been perpetrated by Cone and Ward in the bill of complaint is stated as follows:

"To induce him [Glasby] to make said purchase, they represented to him that said property consisted of a good steam saw-mill and planer, and was desirable and valuable as a business property for saw-mill purposes for custom work; that a full supply of logs and sawing existed and would be furnished by land, timber, and log owners in the neighborhood about said mill, each year for several years, to be sawed on shares or for saw-bill, or both, to and at said mill, to stock the same, and that lumber to supply the planer with work would be furnished by like persons, and enable the mill and also the planer to be successfully and profitably operated; that they, said defendants, had cleared—netted—$3,000 by operating the said mill in sawing logs for others into lumber that season, at said mill, in about sixty days, sawing only about ———

63 MICH.—9.

feet; that they were late in getting the mill ready to saw that season, and for that reason only did not get any more stock of logs that season.

" That they would not sell the property only for the fact that they lived in Bay City, away from the property, and that, to make money more certainly in operating it, the owner should live at St. Louis, near the mill; and that such an owner who was a reasonably good, practical saw-mill man, in charge, could make money in operating it, said mill and planer, and could easily net $3,000 per year, or more, in doing so; that the planer in said mill would be supplied by custom work by lumber owners, and it could also be run and operated at a large profit, and a large net annual income be derived from that also; that a practical mill man like him (Glasby) could easily pay for said property in four years, or less, out of the net profits of operating it, and also pay the interest on it, and on the money borrowed to make the first payment, and pay said money so borrowed.

" That said Glasby informed them, said defendants, that he had no means to buy said property, or to make a payment thereon; that he would like to buy said property if it was as represented, and if the supply of logs and lumber was as stated, and he would do so if he could induce any friend to lend him $1,000 to make the first payment; and thereafter Glasby informed them that complainant would lend the $1,000 to make the first payment, if the property and supply of logs and lumber was as represented, if there was any way of securing him for its repayment in the transaction.

" Said defendants replied that the property was very cheap and desirable, and said Allison would be amply secured by taking the title to himself, and giving a mortgage back for balance of purchase price, and joining with said Glasby in the notes therefor; that said Allison and said Glasby could both rely on the said representations to be true; that very soon, almost immediately, thereafter, said Glasby repeated to said Allison said representations of defendants, and that the said defendants made the same representations in substance to said Allison personally.

"That he believed them and relied on them, and consented to such arrangement, and on the said day, to carry the same out, said defendants (and their wives) executed to said Allison a deed of said property, dated April 19, 1883, and de-

livered it to said Glasby, and he caused it to be recorded April 21, 1883, in Gratiot county register of deeds' office, in volume 53 of Deeds, on page 346; and Allison, believing and relying on said representations to be true, lent Glasby $1,000, and he made the first payment therewith to defendants on said property."

He charges also that he believed and relied upon the representations of said Cone and Ward that they owned said property in fee and had a perfect title thereto, and made no examination as to said title; that since he ascertained the representations were not true in regard to the supply of the logs and lumber he obtained an abstract of title to said property, and it does not show that said Cone and Ward had at that date or have any title thereto; and upon such information and belief he charges that they had no title in fee thereto, and that their representations in that regard were not true.

The complainant then states—

"That said Glasby took possession of said property very soon after said papers were made, and has remained in possession thereof to this time; that he is a good, practical mechanic and saw-mill man, and fully competent to operate said property, and has made every reasonable effort to do so; that, in truth and in fact, there was not and is not a supply of timber and logs in the neighborhood of said property to stock said mill, and a stock could not be and cannot be obtained therefor to saw for saw-bill or on shares, and a stock of lumber could not and cannot be obtained from any lumber owners there to supply or operate said planer with success or at a profit; that it has been and is impracticable to obtain a supply of logs or lumber there to operate said mill or planer with profit; that it has been and is impracticable to manage or operate said mill or said planer, or both, so as to net $3,000, or even one-sixth that sum, annually, from doing so, and said property is in fact of no practical value for and as a custom mill and planer; that all the aforesaid representations made by defendants, and each of them, were not true, and were at the time known to them to be not true, and were made to this complainant and to said Glasby to deceive him (this complainant), and to induce him to

advance said $1,000 to said Glasby, and to receive said deed and execute said mortgage and notes; and he believed and relied on the truth of said statements and representations, and was thereby deceived, and induced to make said loan and receive said deed, and to execute said mortgage and notes."

Defendants answered, denying having made the representations and statements charged in the bill as false and fraudulent, but say that,—

" In the course of said negotiations, they did say, substantially, to said Glasby, that farmers in that vicinity would be wanting logs, that they cut in clearing their land, made into lumber, and would want to have such logs sawed by the thousand or on shares, and they would also want to have lumber dressed; and they also stated to said Glasby that it was a good place to buy logs from farmers and others, and that logs could also be got up the stream upon which said mill is situated; and that a good, practical millman could make money by buying logs, and manufacturing, dressing, and selling lumber, and cutting and dressing lumber by the thousand, at said mill,—all of which statements and representations were understood to be mere matters of opinion, but were nevertheless true; and, in the course of said negotiations, these defendants stated to said Glasby that they, these defendants, had made over $1,800 by operating said mill about seventy days, which representations they aver to be true in fact; and defendants, each for himself, admit that during said negotiations they stated to said Glasby that they were late in getting the said mill started that season, or otherwise they would have had a larger stock of logs, and that the chief reason why they desired to sell said property was because they lived at Bay City, and could not operate it as successfully as if living at St. Louis,—all of which they aver to be true in fact."

They also aver that both complainant and Glasby were experienced lumbermen, and that the premises were purchased after a personal examination of the property, and they were familiar therewith, and with the surrounding country and supply of timber. They admit that they represented themselves to be the owners in fee of the property, and they believe that, at the time they executed the deed,

they had a fee simple title thereto, which they conveyed to complainant.

It will be observed that the sole foundation for the relief prayed for is the fraud claimed to have been practiced upon the complainant by the defendants Cone and Ward.

It appears from the statement and charges made in the bill that Glasby is directly interested in the relief sought, and his rights would be materially affected thereby; yet the bill states no reason why he is not joined as a complainant instead of being made defendant.

From a careful investigation of the record, we are of the opinion that the complainant has entirely failed to establish the fraud charged.

The principal witness by whom the fraudulent representations were sought to be proved was the defendant Glasby. We quote from portions of his testimony given upon his direct examination, viz.:

"*Q.* What representations did either of them make to you in regard to the property, and the supply of logs to operate it that existed in the region about the mill that would be furnished to it as a custom mill?

"*Mr. Gage.* In the course of those negotiations.

"*A.* They said that they thought that there was work enough. Mr. Ward done the most of the talking. They said that they had no doubt that there was all the work it could do, as custom work, to run the mill right along all the time.

"*Q.* Please read the question, and begin again, and answer it.

"*Question read as follows:* 'What representations did either of them make to you in regard to the property, and the supply of logs to operate it that existed in the region about the mill that would be furnished to it as a custom mill, in the course of these negotiations?'

"*Q.* In your answer please state which said it, and what was said.

"*A.* Ward said there was undoubtedly a supply of logs for custom work.

"*Q.* What else did he say?

"*A.* Well, in general conversation, he represented that

there was plenty to do,—lots of custom work, and for the planing-machine.

"*Q.* Where did he say the supply was to come from?

"*A.* Right around the surrounding country there.

"*Q.* And, as to the lumber, what was said about where that was to come from for the planer?

"*A.* He said there would be lots of custom work for the planer furnished around there for building,—those that wanted to build; and such work around the city. And at the same time he stated that there was a lot of lumber there that would naturally want to be planed there,—that he supposed would want to be planed there,—that was talked of to be planed there then; that was there sawed in the yard then.

"*Q.* What was said as to the capacity of the mill,—how many thousand feet it could manufacture in the course of a year?

"*A.* He said the capacity of the mill for the time they had run it had averaged them about 27,000 a day,—the little time they run it while they owned it.

"*Q.* What did he say as to the quantity of logs they had manufactured at that mill during 1882?

"*A.* He didn't state it in that way; he said they had run so many days.

"*Q.* How many?

"*A.* I think he said they had run sixty-three days,— 62 or '3 days; and he said they made about $3,000 out of it on the little time they run it; and he said they only run it 62 or '3 days; that would be the saw-bill amount.

"*Q.* Was anything said—and, if so, what—by him as to why they didn't have a larger supply,—a larger stock of logs?

"*A.* There was nothing said any more than if they had went up the river and bought more logs they would have had more logs, but that was all they could get hold of around there.

"*Q.* What, if anything, was said about their starting the mill late, or any other reason given for not having a larger supply of logs?

"*A.* I don't know as there was anything said about that in particular, except about the repairing of the mill. They had a little repairing to do on the mill, and they started it after they got their repairs done,—after they bought it.

"*Q.* When were those representations first begun, and during what period of time did they continue?

"*A.* They were first talked over, or the substance was talked over, when we was talking about the trade,—when we first commenced trading.

" *Q.* When was that, with reference to the time the trade was consummated?

"*A.* It was a week or ten days beforehand,—two weeks, it may have been.

\*      \*      \*      \*      \*      \*      \*

"*Q.* At that first conversation, what representations did he make in regard to the supply of logs for operating the mill as a custom mill? State what was said on that subject.

"*A.* I can state, in brief, just how that conversation commenced, if that will answer.

"*Q.* Yes.

"*A.* I met Mr. Ward on the walk there, and we were acquainted, and he says to me, 'I've got a little mill I want to sell, and I want you to help me sell it, or to sell it to you.' 'Well,' says I, 'where is it?'" He says, 'It's up to St. Louis.' And he went on to tell me what a nice little mill it was there, right in town, and there was lots to do for it,—plenty to do; lots of sawing to do; and there was a planer, and it would be a nice little property. And says he, 'Another man and I, living down to Bay City, own it, and we don't want anything to do with it. I've got my own business to attend to, and we had rather sell it; it is too far from our business. Now, I want you to hunt me up a customer, or buy it, or something.' 'Well,' says I, 'I will think of it, and look it over.' That was the commencement of it,—that was the start. That was the substance of what we said then. I don't know as there was anything more said about it then. He made the statement of what there was of it, what it could do, and all about it, and we passed along.

"*Q.* What did he say the mill could do?

"*A.* Well, he didn't say then, at that time, how much it would do, or anything about it, only he said it was a good smart little mill; and it was just as good as new,—had been lately fixed up, and it was all in good repair to work. I don't recollect, and I would not say, that he said it would cut 50,000 or 25,000 a day at that time; only that it was a smart little mill, and in a good place, and lots to do. I would not try to say how much he said it would cut a day,—the capacity.

"*Q.* Where next did you have an interview about it?

"*A.* I think the next time we got together I went down

to Bay City, to his shop; more than what we wrote. I wrote to him previous to that. We corresponded some about it. The next time I saw him I went down to Bay City to see him.

"*Q.* Have you already stated all that took place between you at that interview at Bay City?

"*A.* Yes, sir; that is, I have stated what we talked over there in his shop; that was the substance of the conversation.

"*Q.* Where was the next interview you had with them?

"*A.* The next time I met him was at Bay City.

"*Q.* Where?

"*A.* At the same place.

"*Q.* And how long was that previous to the execution of the papers?

"*A.* Well, I could not state exactly the number of days, but it was not but a few days. It was that day, I think, we rather consummated the trade,—very nearly; we came to an understanding point in regard to the trade. I went down there with it in shape, so that I could make him an offer.

"*Q.* Now, at that interview, what was said by him as to the supply of logs for the mill and lumber for the planer?

"*A.* Well, it's just about the same in substance as he said in the first place, only a little fuller. I think he told how much they had done.

"*Q.* Repeat it.

"*A.* What they had done, and what the mill could do; that they had sawed so many days,—62 or 63 days,—and their saw-bill had amounted to about $3,000 for what they had done, and they could saw from 25,000 to 30,000 a day, and what they sawed amounted to about 27,000 a day, what little they did run. The last interview, the second, was about the same in substance as the first.

"*Q.* Well, I desire to have you repeat what was said as to the quantity of logs and lumber that could be obtained there to operate that mill as a custom mill.

"*A.* He said he had no doubt but that we could get all the logs we wanted to saw there. As a custom mill, there was no doubt about our having all we could saw in the mill, that could be got right around there; and, the planer put in good shape, we could have all we could do there of planing.

"*Q.* All you could do with the planer to be operated in what manner?

"*A.*  Custom work.   There was nothing in particular said about anything but custom work.

"*Q.*   Did he state anything—and, if so, what—about the quantity of logs that could or would be supplied to the mill to operate it as a custom mill?

"*A.*   He didn't state it in that way.   He stated there would be lots,—all we wanted to do.   There was no amount or number of logs, or number of feet, mentioned, as I know of.   He said we would have all we wanted to do.

"*Q.*   Now state, if you can, the language which he used in that connection.   If you can't give the words that he used, then give the substance of it; but give the words if you can.

"*A.*   The mere substance of it was that there would be enough to do to be employed right along with the mill,—to make the mill business all the time."

We should hesitate to say that the representations testified to by this witness were anything more than expressions of opinion, and not statements of the existence of positive facts upon which Glasby had a right to rely in making a purchase of the property.   But when we consider the other testimony in the case, which shows that Glasby made a personal examination of the mill property, and made also inquiries of parties living at St. Louis, and had ample opportunity of ascertaining all the facts bearing upon the desirability of making the purchase and the value of the property, we think the representations, if made just as Glasby testifies to them, would not be sufficient to ground the charge of fraud upon, if they should prove to be untrue.   Such representations could not be other than conjectural, and matter of opinion as to whether farmers would bring in enough logs from the surrounding country to stock the mill.

It was proved that the capacity of the mill for cutting logs into lumber was three million feet or over annually. Would any practical saw-mill man suppose or believe, for an instant, that this amount of logs would be cut by farmers, and delivered at the mill for custom sawing, for four or five years in succession?   But defendants deny in

their testimony making the representations testified to by Glasby and by complainant.

Fraud cannot be presumed, but must be established by a preponderance of evidence; and where two witnesses affirm, and two others, no more interested in the subject-matter, and for all that appears fully as creditable, deny, the fraud, it is not proved. The whole testimony, and the able and exhaustive briefs of counsel for complainant, have been carefully read and considered by us, and we are unable to agree with him that the circuit court erred in dismissing the bill.

The branch of the case concerning the alleged defect in title was so connected with the fraud alleged that it must stand or fall with that allegation. Having failed to establish the fraud, complainant must seek his remedy for the alleged defects in the title in some other action.

The decree of the court below must be affirmed, with costs.

The other Justices concurred.