FAHEY v. PELL.

1. APPEAL AND ERROR—DE NOVO REVIEW.
    Review of suit to compel defendants to convey property to plaintiffs is *de novo*, since it is a chancery case.

2. FRAUD—PRESUMPTIONS—INFERENCES—EVIDENCE.
    Plaintiffs, basing right to relief on defendants' fraud, have burden of establishing such fraud and it will not be presumed and cannot be lightly inferred but must be established by a preponderance of evidence.

3. ATTORNEY AND CLIENT—EVIDENCE.
    In suit by minors against attorney for maternal grandfather to compel defendant to convey land to them which he had purchased at scavenger sale but that had formerly been owned by the grandfather, evidence did not establish relationship of attorney and client between defendant and plaintiffs or their guardian, especially where the guardian had employed other attorneys before and after the scavenger sale.

4. FRAUD—ATTORNEY AND CLIENT—EVIDENCE.
    In suit by minors against attorney for their maternal grandfather to recover land which had been owned by the grandfather and deeded to plaintiffs but which had been purchased by defendant at scavenger sale some five years after he had drawn deed running to them, evidence did not establish alleged fraud on part of defendant attorney and his wife or that they should be decreed trustees of the land for plaintiffs' benefit.

5. COSTS—ATTORNEY AND CLIENT.
    No costs are allowed in suit by minors against attorney for their late maternal grandfather under the circumstances of the case notwithstanding bill was dismissed.

Appeal from Allegan; Warner (Glenn E.), J., presiding. Submitted October 5, 1944. (Docket No. 58, Calendar No. 42,797.) Decided January 2, 1945.

Bill by Peggy June Fahey and others, minors, by their guardian James E. Fahey, against Harry Pell and wife for an accounting and decree requiring conveyance of real estate to plaintiffs. Decree for defendants. Plaintiffs appeal. Affirmed.

*Fox, Fox & Fox,* for plaintiffs.

*Harry Pell,* for defendants.

STARR, C. J. In June, 1943, plaintiffs filed bill of complaint alleging that defendant Harry Pell, an attorney at law of Allegan, and his wife, defendant Myra Pell, had "fraudulently confederated and connived to cheat and defraud" and deprive them of certain real estate in Allegan county, and asking that defendants be decreed to convey said property to them and account for damages sustained. Defendants answered, denying the charge of fraud and that plaintiffs were entitled to the relief sought. The trial court entered decree dismissing plaintiffs' bill, and they appeal. This being a chancery case, we review the same *de novo.*

Plaintiffs base their right to recover on the alleged fraud of defendants, and the burden was upon them to establish such fraud. We have repeatedly said that fraud will not be presumed and cannot be lightly inferred, but must be established by a preponderance of evidence. *Mesh* v. *Citrin,* 299 Mich. 527; *Goldberg* v. *Goldberg,* 295 Mich. 380; *Hilliker* v. *Jewel Oil & Gas Co.,* 277 Mich. 96; *Allison* v. *Ward,* 63 Mich. 128. In considering the question of fraud we must determine whether or not the relationship of attorney and client existed between defendant Harry Pell and plaintiffs.

Plaintiffs Peggy, Jimmy, and Winifred Fahey are the minor children of James E. Fahey, who was ap-

pointed their guardian March 2, 1939. Their mother, who was the daughter of Gerrit Koopman, had died about 1931. On January 6, 1936, the children's grandfather, said Gerrit Koopman, executed a deed conveying to them the west half of the southwest quarter of section 17 in Allegan township, Allegan county, but reserving a life estate to himself. Koopman was a client and "good personal friend" of defendant Harry Pell, who prepared the above-mentioned deed. The deed was left in Pell's possession with instructions from Koopman to deliver it to plaintiffs after his death. At about the same time Koopman executed a deed conveying to Pell five parcels of land which had been optioned to the United States government in connection with a submarginal land project. It appears that in his lifetime Koopman received payment from the government for three of said parcels and that after his death Pell received payment for the remaining two parcels. He retained a part of such money for his attorney fees and expenses, paid certain of Koopman's debts, and in February, 1942, distributed the balance to the Koopman heirs, including plaintiff children. Koopman died in November, 1937, but Pell did not record the deed to the children until April, 1938.

Much of the testimony of James Fahey, plaintiffs' guardian, and defendant Harry Pell is in direct conflict. Fahey testified in part:

"I first conferred with Mr. Pell about this property the day following Mr. Koopman's funeral. The conversation took place at Harry Pell's office. * * * Mr. Pell told me about this deed (to plaintiffs) and said he would go down and record it in the children's name and I asked him if he would look after the interest of the children in the estate of Mr. Koopman. He said he would. * * *

"I conferred with Mr. Pell on five or six occasions about the property and about the taxes on the property. Mr. Pell told me that he inquired at the treasurer's office and that there wasn't any of Mr. Koopman's property up for tax sale."

Some time later Fahey obtained a statement from the county treasurer showing $200 or more of delinquent taxes on the land in question. When he subsequently offered to pay such taxes, he was informed that the correct amount was about $448. He did not pay the taxes, and he says that the treasurer advised him to go to the State land office board in Lansing to investigate the matter. When he went to the land office board, he was informed that the State had previously acquired title to the land at delinquent tax sale. The testimony of the county treasurer indicates that in May, 1939, the land was sold for delinquent taxes and was bid in by the State, whose title became absolute in November, 1940. 1 Comp. Laws 1929, § 3467, as last amended by Act No. 234, Pub. Acts 1941 (Comp. Laws Supp. 1942, § 3467, Stat. Ann. 1942 Cum. Supp. § 7.120). (Later amended by Act No. 231, Pub. Acts 1943, not applicable to the present case.) Fahey further testified:

"After the trip to Lansing, I conferred with Mr. Pell. He gave me the deed to the property and informed me that I ought to pick it up at the scavenger sale and by doing that I would know where I stood and I would have a clear title to it from the State. Before he gave me the deed, he copied the description of the property in a book he had on his desk. I did not confer with Mr. Pell again before the scavenger sale."

Defendant Harry Pell denied that he was employed to act as attorney for Fahey or plaintiff

children and denied that he advised Fahey to acquire the property at scavenger sale. He testified in part:

"After Mr. Koopman's death, my first conversation with Mr. Fahey was shortly before the deeds were recorded— * * * in April of 1938. * * *. At that time I told Mr. Fahey that there were back taxes on the property and that he should see * * * that they were taken care of. * * * He left and I didn't see him again for some time. He came in some time later and said that * * * he had got a statement from the treasurer as to the taxes, and that the way the treasurer had them figured out he didn't think that it was worth while paying them up and taking the property. He said that I advised him to let it go to scavenger sale, but I absolutely did not advise him to let it go to scavenger sale. * * *

"I didn't see Mr. Fahey again until, as he says, June of 1942."

The land was offered at the scavenger sale held in February, 1941, but there were no bidders. It was reappraised and again offered at the scavenger sale held July 29, 1941. At such sale Harry Pell bid in the property in the names of himself and wife for $800 and paid $160 down, the balance to be paid in monthly instalments. He testified that the morning of the sale a Lithuanian client named Loren, who resided in Chicago, came to his office and requested him to bid in a certain description of land to be offered for sale and make the necessary payment, and that the client agreed to reimburse him. His testimony in this regard was corroborated by Loren. He further said that at the time of the sale he did not know that the description he was bidding on was the land Koopman had deeded to plaintiff children.

Fahey testified that he had expected Pell to advise him when the scavenger sale would be held, but that Pell failed to do so. He further said that he first learned about the scavenger sale from attorney Carl Hoffman of Allegan, who telephoned him the night before the sale, and that he arranged to borrow $800 to bid in the land. Hoffman represented Fahey and bid for him at the sale, and the record indicates that Hoffman and Pell bid against each other until the price reached $800, when the land was struck off to Pell. Fahey said that a few days after the sale, he talked to Pell about the land and that Pell said "he would see if he could make arrangements to turn it over to me, that he had bought it for another client and he would, if he could, give it back to me." After the sale Pell told attorney Hoffman, "If I had known that Jim (Fahey) was interested in it I wouldn't have bid on it."

Fahey later employed attorney George Gould of Kalamazoo and there were consultations and correspondence relative to an amicable settlement between Pell and Fahey, as guardian. Gould testified in part:

"I contacted Mr. Pell at his office in Allegan. * * * I said, 'Well, Harry, isn't there some way that this matter can be settled without any difficulty,' and he said, 'There won't be any difficulty about it, we won't have any trouble.' He said, 'We will get it all straightened out to the satisfaction of everybody.' * * *

"I next conferred with Mr. Pell when he came to my office in Kalamazoo. * * * At that time he said that we would get it all straightened out and everybody would be happy, or words to that effect, * * * I didn't know * * * that he had any objections to my representing Mr. Fahey. * * *

"I called him on the telephone on the 18th day of May of this year (1943). * * *

"I said, 'Harry, I have got the money here to settle this Fahey matter all up.' He said, 'It is too late. * * * I have sold the property.' * * * I said, 'Well, I wanted to be sure he [you] was going to be there because I was going to bring the money over and tender it to you.' He said, 'It won't make any difference if you come over to tender it, I won't take it anyway, the property is gone and you are too late. * * * You fooled around too long.'"

There was testimony indicating that the land in question was worth about $2,500. The client Loren, for whom Pell claims to have bid in the land, never reimbursed or repaid him and in 1943 Pell sold it to a Mr. Hall for $2,000 with a down payment of $500, which sum is now held by the purchaser's attorney, pending the outcome of this suit. Pell said in substance that if the sale to Mr. Hall at a price of $2,000 was consummated, he would probably make a profit of about $1,000. At the trial Pell personally made an opening statement in which he said in part:

"A colored man (Hall) from Chicago came in and he offered me $2,000 for it, and I sold it * * * at that price. * * * He made a deposit of $500 through Mr. Luna, * * * and he went into possession of the property. * * * I explained to Mr. Luna that that $500 was to be spent in the purchase of defense bonds for the Gerrit Koopman grandchildren (plaintiffs) and what happened to the rest of it would depend on the circumstances as they developed."

Certain of Pell's statements, and his conduct subsequent to the scavenger sale, indicate a rather peculiar and uncommendable attitude on his part. He denied that he had represented Fahey or plaintiff

children and denied any legal obligation to them. However, he repeatedly indicated that he did not want any profit from the land and that he wanted the children to have the land or the proceeds from its sale. At the same time he refused to deal with Fahey's attorneys and insisted upon dealing with Fahey personally. He said in substance that he would handle the matter in whatever way he considered proper. His attitude is indicated by his following testimony:

"I did see Mr. Gould shortly after the letter he wrote me in October, 1941.  *  *  *  The matter of the tax sale did come up, and I told George (Gould) that I would be very happy if the (scavenger sale) deed could be canceled, that it would let me out with the Lorens, and Jim (Fahey) could get it by paying the taxes, or any way that he wanted to. I suggested that a petition be prepared if the situation warranted that.  *  *  *

"I told Carl (Hoffman) that if there was anything I could do I would be glad to do it, and I told Jim the same thing, that possibly the sale could be set aside.  *  *  *

"I  *  *  *  talked with Carl in the outer office, and I took Jim into my office and I said, 'Jim, I can't have anything to do with Carl Hoffman in this deal at all.' I said, 'I will be glad to do anything that I can, but I don't want anything to do with Mr. Hoffman.'  *  *  *

"I told Jim I would deal with him alone.  *  *  *

"I told Mr. Fahey  *  *  *  I wanted him to come personally, that I didn't want to have any negotiations with Mr. Gould.  *  *  *

"*Q.* Now the last time you talked with Mr. Fahey at your office did you tell him that you would deed him the property for what you had in it?

"*A.* No, I didn't. I told him I didn't want to make anything out of it at all, and if he could get the deed canceled it would let me out.  *  *  *

"I never did tell Mr. Gould or Mr. Fahey that I would give them a deed to the property for $800. I told them that so far as I was concerned I didn't want anything out of it except what I had put in it. * * *

"*Q.* Mr. Pell, were you serious when you said that you wanted the Fahey children to have their interest in this farm?

"*A.* Well, that was always my idea. * * *

"*Q.* And you frequently said that you didn't want to make any profit out of the deal?

"*A.* That was it. * * *

"*Q.* But it is a fact, isn't it, as early as May 28, 1942, you wrote Mr. Fahey a letter telling him that if he was interested in it to see you and you would make a deal, and there was nothing said about the Lorens, isn't that right?

"*A.* Sure, that is right, no question about that. * * *

"*Q.* Well, do you consider yourself Mr. Fahey's attorney?

"*A.* No, I didn't consider myself Mr. Fahey's attorney; I was going to see that those children got their interest in that property. * * *

"The only obligation I recognize in this matter is my obligation to Gerrit Koopman. * * *

"Because they are his three grandchildren I expect to see that they get what is right.

"*Q.* Well, you just decided then that Jim Fahey didn't need a lawyer and therefore you wouldn't have anything to do with George Gould?

"*A.* I just decided that I was going to see that the children's interests were protected. * * *

"*Q.* You wanted them (Fahey) to get some evidence so you could get the sale set aside, isn't that what you asked them in the letter (of February 10, 1942)?

"*A.* I told them to give me the information of what happened and if we could get the sale set aside, I would do it. I wasn't acting as his attorney, I

was acting—trying to get myself out of as bad a mess as I could. It wasn't very pleasant for me, I was trying to do the best I could for Jim.   *   *   *

"*Q.* You mentioned the matter of a $500 defense bond which you said you proposed to buy for the three children, did you ever tell Mr. Fahey about that?

"*A.* I haven't talked with Mr. Fahey, I wouldn't have told him anyway.   *   *   *

"*Q.* Did you ever tell attorney George Gould about that bond?

"*A,* I didn't tell George Gould nothing.   *   *   *

"*Q.* Well, did you intend it as a gift?

"*A.* I don't know what—just what legal classification it would have.   *   *   *

"*Q.* Did you feel yourself under some moral obligation to the Fahey children?

"*A.* Absolutely none to the Fahey children.

"*Q.* Did you feel yourself under a legal obligation to the Fahey children?

"*A.* Not at all,   *   *   *   I just didn't want any money out of the deal myself, that is the way I felt, but I wasn't going to turn it over to Jim Fahey or George Gould or Carl Hoffman.   *   *   *

"*Q.* Are you willing to turn this property over to the Fahey children for the money you have in it?

"*A.* Under the present situation I am not saying what I am willing to do.   *   *   *

"I expect to do what I consider proper with the money; I am not making any agreement with Mr. Gould or with Mr. Fahey or with you.

"*Q.* You are the law unto yourself?

"*A.* So far as this matter is concerned, unless the court says otherwise, I am going to dispose of the money the way I consider it shall be disposed of.   *   *   *

"I am not going to be put in the position of doing something and having Mr. Gould say that he compelled me to do this or that."

Although indicating a recognition of some moral obligation to plaintiff children, Pell's above-quoted statements, made subsequent to the scavenger sale, do not establish that the relationship of attorney and client existed between them. He made no charge to the children or James Fahey and they did not pay or offer to pay him for services which they contend he rendered as their attorney. It reasonably appears that whatever amount Pell retained from the sale of submarginal lands deeded to him by Koopman was for services and expenses chargeable to Koopman or his estate. His connection with Koopman and his distribution to Koopman's heirs of certain money received from the sale of submarginal lands did not establish the relationship of attorney and client between him and plaintiffs.

Pell testified that at the time of the scavenger sale he did not know that the land which he purchased was that covered by the deed from Koopman to plaintiff children, and, there being a lapse of five years or more between the preparation of the deed and the scavenger sale, it cannot reasonably be inferred that he had such knowledge. He expressly denied that Fahey employed him to represent plaintiffs, and in any event, it appears that prior to the scavenger sale Fahey arranged with attorney Hoffman to represent and bid for him at the sale. Furthermore, Fahey, as guardian of plaintiff children, who were the former owners of the land, failed to protect their interests by meeting Pell's scavenger-sale bid of $800. See Act No. 155, § 7, Pub. Acts 1937, as last amended by Act No. 363, Pub. Acts 1941 (Comp. Laws Supp. 1942, § 3723-7, Stat. Ann. 1942 Cum. Supp. § 7.957). (Later amended by Act No. 159, Pub. Acts 1943, not applicable to the present case.)

We have carefully examined the record but find no evidence establishing, or from which it could

reasonably be inferred, that the relationship of attorney and client existed between plaintiffs and defendant Harry Pell. We conclude that plaintiffs failed to establish the alleged fraud on the part of defendants. Furthermore, we find no basis for plaintiffs' contention that defendants should be decreed to be trustees, for their benefit, of the land in question or the proceeds thereof.

The decree of the trial court dismissing plaintiffs' bill is affirmed. By reason of the facts and circumstances shown by the record, no costs are allowed.

NORTH, WIEST, BUTZEL, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.