# Richmond

JOHN F. FENSOM v. RUSSELL L. RABB.

March 13, 1950.

Record No. 3583.

Present, Hudgins, C. J., and Eggleston, Buchanan, Staples and
Miller, JJ.

The opinion states the case.

*Sands, Marks & Sands*, for the plaintiff in error. ·

*Allen, Allen & Allen*, for the defendant in error.

Hudgins, C. J., delivered the opinion of the court.

Russell L. Rabb instituted this action of trespass on the case in assumpsit, alleging misrepresentation of a material fact by defendant, John F. Fensom, which induced him to purchase the latter's business, and that as a result of such misrepresentation he had been damaged in the sum of $25,000. To a judgment for $9,000, entered on the verdict of the jury, defendant obtained this writ of error.

John F. Fensom, hereinafter designated "defendant," 68 years of age, for more than twenty-five years had been con-

ducting, in Richmond, Virginia, a manufacturers' agency, under the name of John Fensom Company. This agency represented a number of nationally-known manufacturers of industrial machinery. Negotiations between the plaintiff, defendant and R. A. Ricks, a real estate broker who represented the plaintiff but was paid by defendant, culminated in a contract dated April 26, 1947, in which plaintiff agreed to pay defendant $25,000, and take possession and control of the business on May 15, 1947. The pertinent provisions of the contract, which was in the form of a letter written to and accepted by plaintiff, are as follows:

"* * * I am selling you my business with the following understandings:

"1. You are to be permitted to run the business under the present name of John Fensom Company, the address of which is The Atlantic Life Building, Richmond, Virginia.

"2. With the company you will purchase all of its good will, its business connections, its office furniture and equipment; its business records excepting ledger and cash book, and I am to assign to you the company's present lease on its office space and other similar assets. I am to pay all liabilities of the company, up to May 15th, 1947. The rent is to be prorated as of the date that you take possession, as is also my secretary's salary.

"3. I am to receive profit on all contracts made prior to May 15th, 1947, and I am to pay all taxes earned by the John Fensom Company to that date. I am to use my best efforts in helping you to retain the present accounts I have, and for a period of six months, if necessary, I am to assist you in any reasonable way I can in helping you to run the business. You are to pay me a nominal salary of $100.00 per month as long as you need my assistance and pay my traveling expenses for any trips that it seems necessary for me to make.

"4. I agree not to enter into a competitive business with you.

"5. It is to be understood on your part that the statement of earnings shown in a letter from T. Coleman Andrews & Company does not take into consideration any taxes.

"6. I represent to you that I am the sole owner of the John Fensom Company, which is not a corporation, and that the company still represents the various corporations in Virginia, a list of which corporations I gave you, * * *"

The tangible property consisted of office furniture and equipment valued at less than $1,000. The most valuable assets purchased were the right to use the name of John Fensom Company, its good will and business connections, including records of the names and addresses of its customers, and the written contracts with nine manufacturers, whereby the John Fensom Company was given the exclusive right to sell, within a specified area, their manufactured products.

While the separate contracts with the manufacturers were made annually and expired of their own limitation at the end of the year, the contracts with Fisher Governor Company and The Fulton Sylphon Co., two of the nine manufacturers listed, had been renewed from year to year over a period of more than twenty years. It was the usual business custom of manufacturers to renew their contracts with their sales representatives when the activities of such representatives had been satisfactory to them. During the negotiations defendant had assured plaintiff that he was "in good standing" with all the manufacturers represented by him.

Plaintiff, pursuant to the contract of purchase, and on the effective date thereof, took possession and control of the business, and, with the assistance of defendant, conducted it for five months without notifying the manufacturers that he had become the owner. On October 18, 1947, the Fisher Governor Company wrote the John Fensom Company that it did "not plan to renew our present sales agreement after it expires on December 31, 1947." On receipt of this letter plaintiff went to Marshalltown, Iowa, the home office of the company, where he was informed that definite ar-

rangements had been made with another party to represent the Fisher Governor Company in Virginia upon the expiration of the existing contract with defendant. Later plaintiff was notified that The Fulton Sylphon Co., of Knoxville, Tennessee, would not renew its contract. Defendant declined plaintiff's request to cancel the contract and re-pay the purchase price. Thereafter this action was instituted.

The basis of the action is fraud—that is, plaintiff contends that defendant made a misrepresentation of a material fact which induced him to purchase the business which he otherwise would not have done. As the trial court said: "The case is a novel one in several of its features. The contracts of The John Fensom Company with the manufacturers whom it represented were annual, and for all practical purposes contracts-at-will due to the revocability clauses therein. The plaintiff knew this. There was no assurance any one could give that the manufacturers would renew their contracts from one year to the next. The defendant could not make any guarantee of this and the plaintiff knew it. Even if the manufacturers contemplated renewing their contracts with The John Fensom Company under its traditional ownership, that would be no assurance on its face that they would renew the contracts under new ownership and management. No uncertainty existed in the minds of either party concerning this. The contract in this respect was an aleatory one. The only factors, therefore, to guide a purchaser of such a business would be those which bore on the probability of such a renewal, and of those, the most important one would be the present standing of the defendant with the manufacturers. The defendant represented that he was 'in good standing' with the manufacturers."

The decisive question presented is whether the statement to plaintiff that defendant was "in good standing" with the manufacturers was material, false, and made under circumstances reasonably calculated to induce plaintiff to purchase the business.

The circumstances of the parties, the negotiations leading to the execution of the contract, and the nature of the contract itself, are relevant matters to be considered in determining the meaning and materiality of the phrase "in good standing."

Early in 1947, plaintiff contemplated changing his employment and becoming the owner and operator of a business of his own in Richmond, Virginia. With this end in view, he requested R. A. Ricks, a real estate broker, to ascertain for him whether or not one of several hardware stores might be acquired. Ricks' efforts to purchase a hardware store were futile. Plaintiff informed Ricks that he had heard that the John Fensom Company could be purchased, and asked him to contact defendant for him. Defendant had made an effort to sell an interest in, but not his entire business. Ricks, after several interviews with defendant, was told that he would sell for $50,000. Plaintiff countered by offering $20,000.

Sometime during the negotiations, and before the sale plaintiff sought the advice of his father-in-law, John A. McPherson, an engineer, familiar with this class of business, having, as he stated, set up a number of similar sales agencies for different manufacturers. Plaintiff and McPherson requested defendant to give them an exact statement of the volume of business, and the profits made, for the years 1935-1946, inclusive. Defendant was requested to have the figures given verified by a certified public accountant. He complied with this request and employed T. Coleman Andrews Company, who, after a thorough examination of the books and records, ascertained that the figures given by defendant were accurate. The books and files showing the names and addresses of the numerous customers to whom defendant had sold merchandise during the ten preceding years, were made available to plaintiff and his advisor. The written contracts with the nine manufacturers were exhibited to plaintiff. Plaintiff's attention was called to the fact that each contract terminated

at the end of 1947, and might be cancelled by either of the contracting parties on thirty or sixty days' written notice.

Witnesses for both plaintiff and defendant testified that manufacturers, as a rule, are reluctant to transfer their sales agencies from one party to another, and that while the contracts with the agents are written on a year to year basis, they are usually renewed as a matter of course if the agent's representation of the manufacturers had been reasonably satisfactory.

McPherson said, in answer to the following question:

"Q. What did Mr. Fensom say to you about his standing with these manufacturers?

"A. He said they were good. I suggested to Mr. Fensom, rather I suggested to Mr. Rabb and Mr. Fensom both, it might be well to investigate them. Mr. Fensom objected to it. He said he thought it would be a mistake. He said that it might stir up some trouble and might cause them to be cancelled, but I felt as a matter of just proper business judgment that it would be well, because knowing the value and importance of maintaining them that (they) should be investigated and checked, and he discouraged the idea.

"Of course, I didn't press it because I felt that was something that Mr. Rabb would have to decide, but that was my thought and suggestion."

In addition, defendant told plaintiff that if plaintiff interviewed the manufacurers, his lack of knowledge of the manufacturers' products would be disclosed, and hence he thought it was better for plaintiff to familiarize himself with the products and the business before interviewing the manufacturers. Plaintiff, with the suggestion of his father-in-law and defendant before him, decided to consummate the purchase without interviewing the manufacturers.

Much of the argument in the briefs is devoted to the question, whether the phrase "in good standing," as used by the defendant, was an expression of opinion, or was a statement of material fact upon which plaintiff had a right to rely in making the purchase. However, in our view of

the case, it is immaterial whether the phrase be construed to be an expression of opinion or a statement of fact. The most valuable asset purchased was the "good will" of the John Fensom Company. This asset was intangible. It consisted of the opinions the customers of defendant, and the manufacturers whose products defendant sold, had formed of his business policies and his method of conducting the sales agency. The good opinion—the good will—of a business is property, recognized and protected by law as such.

When defendant stated to plaintiff that he was "in good standing" with the two manufacturers in question, he meant, and the plaintiff understood him to mean, that his representation of the manufacturers had been, and was then, reasonably satisfactory to them. Literally, the statement was defendant's opinion of the manufacturers' opinion of his representation of them. The manufacturers at the time the sale was made had an opinion of defendant's representation of them. It was an existing fact that could have been ascertained if proper inquiries had been made. This statement that he was "in good standing" with the manufacturers, whether construed to be an expression of opinion or statement of fact, was material.

"The representation must, as a general rule, be of a fact as distinguished from a mere matter of opinion, which ordinarily is not presumed to deceive or mislead, yet a matter of opinion may amount to an affirmation, and be the inducement to a contract, especially when the parties are not dealing upon equal terms, and one of them has, or is presumed to have, means of information not equally open to the other." *Grim* v. *Byrd*, 32 Gratt. (73 Va.) 293, 301. See *Mears* v. *Accomac Banking Co.*, 160 Va. 311, 168 S. E. 740; *Garrett* v. *Finch*, 107 Va. 25, 57 S. E. 604; *Trust Co.* v. *Fletcher*, 152 Va. 868, 148 S. E. 785, 73 A. L. R. 1111.

The decision of the case turns on whether the evidence offered by plaintiff was sufficient to prove that defendant's statement that he was "in good standing" with the manufacturers was false.

The court properly instructed the jury that the burden of proving defendant was not in "good standing" "by clear, strong and convincing evidence rests upon plaintiff," and if the jury found that plaintiff had borne this burden, the measure of his damages was "that proportion of $25,000 (the amount of the purchase price) which the good will of such manufacturers with whom the jury might find defendant was not in good standing bears to the total good will contracted for."

The commissions received by defendant from the sales of the manufactured products of the Fisher Governor Company and the Fulton Sylphon Co., were approximately 42% of his business. The exact percentage over a three-year period (1944 to 1946, inclusive) was:

|                  | 1946 | 1945 | 1944 |
|------------------|------|------|------|
| Fulton Sylphon   | 21%  | 31%  | 29%  |
| Fisher Governor  | 14%  | 14%  | 18%  |
| All others       | 65%  | 55%  | 53%  |

The plaintiff, in order to prove that defendant was not in "good standing" with Fisher Governor Company offered certain exhibits and the testimony of certain witnesses, and certain other exhibits and testimony of other witnesses to prove the same allegation as to the Fulton Sylphon Company. Inasmuch as the case will have to be reversed and remanded for a new trial, it is not deemed necessary to discuss the evidence tending to prove defendant's standing with Fisher Governor Company. A careful examination of that evidence convinces us that it was sufficient to take to the jury the question of the truth or falsity of defendant's statement to the effect that he was "in good standing" with the Fisher Governor Company.

We do not think that the evidence offered by plaintiff was sufficiently clear, definite and convincing to take to the jury the question of the truth or falsity of defendant's statement to the effect that he was "in good standing" with the Fulton Sylphon Co.

Plaintiff relied upon the testimony of two witnesses to prove that defendant was not in good standing with the Fulton Sylphon Co., namely: (1) W. H. Kidd, who now represents both manufacturers within the area in which defendant formerly represented them; (2) Freeman Cross, the Vice-President and Sales Manager of the Fulton Sylphon Co.

Kidd testified that he had an informal discussion with the Fulton Sylphon Co. in the midsummer of 1947 for the purpose of seeking employment as a sales representative of the company in Virginia. Some time elapsed before the formal contract was executed, which did not become effective until May 1, 1948. He thought a friend had contacted the company for him in the late spring of 1947. Prior to that time he had been discussing the matter with the Fisher Governor Company and he thought the two manufacturers "moved pretty much together." But these were separate and distinct manufacturers, the headquarters of the Fisher Governor Company being in Marshalltown, Iowa, and the headquarters of the Fulton Sylphon Co. in Knoxville, Tennessee.

Mr. Cross, the sales manager of all the sales representatives of the Fulton Sylphon Co. was in the best position to know defendant's standing with the company. The substance of his testimony is that at the close of World War II (1945), the company decided "as a matter of basic policy, to revamp our outside sales organization." He said he did "not think it necessary to go into how we intended to revamp." Notwithstanding the fact that the company had decided to change its policy concerning its sales representatives, it renewed the contract with defendant for the years 1946 and 1947. This witness did not inform defendant that his company was contemplating a change in policy and defendant had no knowledge of that fact. It was not until the last of the summer or early fall of 1947 that Mr. Cross discussed with Mr. Kidd his company's contemplated change in policy and the possibility of employing him as its sales manager in Virginia.

He said that if plaintiff had informed him that he had

bought defendant's business before he had bound himself to Mr. Kidd, he would have asked for a conference with plaintiff and defendant, either in Richmond or in Knoxville, to discuss with them the contemplated change of policy and the possibility of plaintiff representing his company in Virginia.

The testimony of these two witnesses on the question of defendant's standing with the Fulton Sylphon Company was not sufficiently clear, definite and convincing to submit to the jury the issue of the truth or falsity of defendant's representation to plaintiff.

This is the only logical conclusion to be drawn when this testimony is considered with the uncontradicted facts existing at the time defendant made the statement, namely: (1) defendant's contract had been renewed from year to year for more than twenty consecutive years; (2) shortly before defendant made the statement he had received a renewal contract for the year 1947; (3) defendant's sales of this company's products for the year 1946 exceeded his quota by more than 50%, for which he had received a substantial bonus; (4) this company had made no complaint to defendant, nor had it criticized his method of representing them; (5) it does not appear from the evidence that the company's decision in 1945 to change its policy of representation was the result of any dissatisfaction with defendant's conduct of the company's business in the territory assigned to him.

Defendant's statement that he was in good standing with the Fulton Sylphon Co. should not be construed to include a secret contemplation of the company to revamp its overall basic sales policy some time in the future unless such change of policy was induced or caused by the company's dissatisfaction with defendant's representation of them. Whether the company would renew its contract with defendant was a chance which plaintiff took when he bought the business, without ascertaining from the company its contemplated action. To hold otherwise would impose upon defendant the obligation of guaranteeing renewal of

the company's contract. This plaintiff knew was not within the power of defendant. Plaintiff having taken this chance cannot now recoup his losses from defendant.

This leads to the consideration of the next assignment of error, which is based on the action of the court in giving Instruction No. 4, which reads as follows:

"The Court instructs the jury that unless they believe from the evidence that, at the time of the sale of the John Fensom Company, the Fisher Governor Company or the Fulton Sylphon Company contemplated not renewing their contracts with the John Fensom Company, then the jury must find their verdict for the defendant."

The vice in this instruction is that it, in effect, told the jury that defendant was liable to plaintiff if the manufacturers were for any reason contemplating making a change in its representation in the Virginia territory. Plaintiff's whole contention is based on the theory that defendant was not "in good standing" with the manufacturer and that this want of "good standing" was the sole reason for the manufacturer's failure to renew its contract with defendant. As heretofore stated, it appears from the testimony of the sales manager of the Fulton Sylphon Co. that since 1945 the company had been contemplating making a change in its policy, but it does not appear that this contemplated change was due to any dissatisfaction the company had with defendant's conduct of its business.

The instruction eliminated this phase of the testimony from the jury. The jury found it confusing, because after they heard arguments of counsel and retired to consider of their verdict, they returned to the court room and asked the court:

"Your Honor, we returned to the courtroom to ask the Court a question regarding Instruction No. 4, and to ask if the Court will reread it and we ask if it is worded just the way you wanted to give it to us."

"By the Court: Yes, it is worded just the way I wanted to give it to you. The Court instructs you that unless you

believe that at the time of the purchase by the plaintiff of the business of the John Fensom Company the Fisher Governor Company and the Fulton Sylphon Company contemplated not renewing their contract then you find for the defendant. Unless you believe that these two companies were in April, 1947, contemplating not renewing you find for the defendant. In other words, it is your duty to consider were these two manufacturers contemplating or not contemplating taking their contract away from the Fensom Company. Now, unless you believe that they were contemplating not renewing, then you find for the defendant."

This verbal instruction but emphasizes the vice contained in the written instruction.

Plaintiff's right to recover was not based upon what the manufacturer contemplated doing, but whether or not defendant falsely stated that he was "in good standing" with them. If the statement was true plaintiff was not entitled to recover. The instruction to the jury should have focused their attention upon determining whether the statement of defendant as to his "good standing" with the company was true or false and not upon what the manufacturers were contemplating doing.

Defendant's third assignment of error is based on the action of the court in permitting plaintiff to amend his declaration.

The original declaration was "a plea of trespass on the case in assumpsit." The body of the declaration was consistent with either a plea in fraud and deceit, or a plea in assumpsit, —that is, the gravamen of the complaint was the alleged misrepresentation by the defendant of his good standing with the manufacturers whom he represented. The *ad damnum* clause sounded in deceit and claimed damages in the sum of $50,000, whereas, in assumpsit, plaintiff would be entitled to the difference between the value of the business as it was represented to be and the value of the business as it actually was. Defendant objected to the declaration on these and other grounds. Whereupon, the court directed plaintiff to

amend his declaration by "omitting the last two paragraphs and substituting" therefor "such additional allegation as may sound in unjust enrichment and quasi contracts. * * * To which opinion of the Court counsel for both sides concur." The effect of the amendment was to limit the possibility of recovery by the plaintiff to $25,000, instead of $50,000, to eliminate certain items of damage claimed in plaintiff's bill of particulars and in next to the last paragraph of the original declaration.

In *Schmidt v. Wallinger*, 125 Va. 361, 99 S. E. 680, the defendant, a real estate broker, falsely represented to the plaintiff the terms on which an exchange of her property could be effected, the result being that the broker made a hidden profit. Objection was made to the form of action which was a declaration of trespass on the case in assumpsit. Speaking to the point, we said:

"The special count does allege a fraudulent and tortious transaction, but one in which the defendants are charged with having received money belonging in good conscience to the plaintiff, and for the refunding of which the law implies a promise. The action is specifically designated in the declaration as assumpsit; and that form of action, if the plaintiff desired to waive the tort, was appropriate for the recovery of the money. 1 Bart. Chy. Pr. 125; Burks' Pl. & Pr. 121; *Baltimore, etc., R. Co. v. Burke*, 102 Va. 643, 647, 47 S. E. 824." See *Norfolk v. Norfolk County*, 120 Va. 356, 91 S. E. 820; *Tidewater Quarry Co. v. Scott*, 105 Va. 160, 52 S. E. 835, 115 Am. St. Rep. 864, 8 Ann. Cas. 736, and *Raven Red Ash Coal Co. v. Ball*, 185 Va. 534, 39 S. E. (2d) 231, 167 A. L. R. 785.

Defendant, in the original declaration, and in the bill of particulars, was called upon to defend a charge of alleged misrepresentation concerning his "good standing" with the manufacturers, and under the amended declaration he was not called upon to defend anything more or different. The amendment did not change the form of the action, but

even if it did, the defendant, having consented to the amendment, is in no position to object to it in this Court.

Defendant contends that his plea in arrest of judgment filed after verdict, but before judgment was entered, should have been sustained, on the ground that he had not been required to plead to the amended declaration.

He filed a plea of non assumpsit to the original declaration and a full statement of his grounds of defense. Neither was withdrawn. This being true, the plea to the original declaration is considered a joinder of issue to the amended declaration.

The same question, on similar facts, was raised more than a hundred years ago in *Power* v. *Ivie*, 7 Leigh (34 Va.) 147, where Judge Brockenbrough said:

"The remaining objection is, that on this amended declaration the jury are sworn to try the issue, when in fact there was no plea pleaded by the defendant to that declaration, and consequently no issue to be tried. But the answer given was, that non assumpsit was pleaded to the original declaration, and was never withdrawn, and that that plea stood as the plea to the new declaration; and so are the authorities. *Eppes* v. *Demoville*, 2 Call (6 Va.) 22, and *Vaiden* v. *Bell*, 3 Rand. (24 Va.) 448."

This Court held in *Bank of Occoquan* v. *Bushey*, 156 Va. 25, 157 S. E. 764, which was an action in assumpsit, that where the parties had proceeded to introduce all the evidence as if a plea of the general issue had been filed, it was too late after verdict for the losing party to object to the failure of defendant to file a plea to the declaration.

Our conclusion is that the trial court erred (1) in failing to hold, as a matter of law, that plaintiff's evidence was insufficient to prove the falsity of defendant's representation as to his standing with the Fulton Sylphon Company, and (2) in giving Instruction No. 4.

*Reversed and remanded.*